**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANGELO MARTINO** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 04 C 2870** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **KRAFT FOODS, INC. and** | ) | |
| **DAWN GILLERMAN** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Before this Court is Defendant Kraft Foods Global, Inc.'s ("Kraft")[1] and Defendant

Dawn Gillerman's motion for summary judgment. For the reasons set forth below, Defendants'

motion is granted in part and denied in part.

**I.      FACTS**

Plaintiff Angelo Martino ("Plaintiff" or "Martino") worked for Nabisco (and a precursor

company, Standard Brands) from 1978 to 1982. Martino returned to Nabisco in 1984; from July

1984 until November 1995, he worked as the Cost Accounting Manager for the Nabisco Chicago

Bakery. In November 1995, Plaintiff was promoted into the position of Plant Controller (Salary

Grade 12) for the Niles Bakery after Nabisco was acquired by Kraft. As controller for the Niles

Bakery, Martino was ultimately responsible for all the accounting and all the finance, including

---

[1] The Plaintiff incorrectly named the Defendant as "Kraft Foods, Inc." in his complaint. The proper name is "Kraft Foods Global, Inc." This Court will refer to the defendants jointly as "Kraft" throughout to avoid confusion.

financial reporting, for the bakery. In this position, Martino reported directly to the Niles Plant Manager and indirectly to the Manufacturing Controller for the Biscuit Division.

The Plant Controller was required to provide counsel on financial issues; assess business performance and manage risks; gather, analyze and communicate financial results and other data; lead planning and forecasting processes; and support a strong internal control environment. Kraft also required employees in Salary Grades 10-13 to meet expectations in certain "leadership" competencies, including meeting the requirements of both internal and external customers; communicating the department's strategic direction; hiring, developing, and evaluating staff and departmental teams; and maintaining a high standard of personal integrity, performance, and self-appraisal. Martino admits receiving Kraft's description of Core Competencies for employees in Salary Grades 10-13 in August or September 2002. On a daily basis, the Plant Controller was required to work closely with plant management and his staff to process and communicate financial results in a timely fashion; attend staff meetings and supervise his staff; and supervise, train, and develop his staff for advancement.

In 1993, Martino began seeing Dr. Farid Karimi, a psychiatrist, for anxiety and depression. Dr. Karimi diagnosed Martino with dysthymic disorder and panic disorder with agoraphobia. Dysthymic disorder is a chronic form of depression that has continued for two or more years. Panic disorder with agoraphobia is a generalized diagnosis that covers a spectrum of anxiety disorders. Although Martino's anxiety sometimes presented itself in public settings, Dr. Karimi did not think that Martino's symptoms "qualified for social anxiety disorder alone." Karimi did not diagnose Martino with obsessive compulsive disorder ("OCD") or social anxiety disorder in 1993 or at any other time. Karimi believed that Martino had some "flavor" of OCD

but did not have "pure" OCD. In his deposition, Dr. Karimi testified that he "had never told [Martino] he ha[d] social anxiety disorder and ha[d] never diagnosed him with social anxiety disorder." Dr. Karimi stated that he diagnosed Martino with panic disorder with agoraphobia because it was a more comprehensive diagnosis that covered most anxiety disorders, such as social anxiety disorder and OCD; however, Dr. Karimi stated that Martino did not meet the diagnostic criteria for either social anxiety disorder or OCD.

Martino also had problems with chronic low back pain from degenerative disc disease, for which he had surgery in 1996. In December 2002, Martino saw an orthopedist for increased low back and leg pain.

Between 1996 and 2000, Martino received year-end performance ratings from at least three successive plant managers of either "distinguished" (in 1996) or "commendable" (in 1997-2000), which were Nabisco's top two performance ratings. During this time, the "Development Plan" and "Action Plan" included in Martino's year-end performance reviews repeatedly discussed the importance of increasing the amount of staff training Martino conducted, identifying and prioritizing the annual objectives, and working more closely with plant management. Specifically, Martino's performance reviews indicated an ongoing need to improve his staff training and development and increase his communication with his supervisors and fellow plant managers.

In approximately July 2001, Dawn Gillerman became the Plant Manager at the Niles Bakery and Martino's direct supervisor. Gillerman had worked for Nabisco (and for Kraft) since 1983. Gillerman and Martino previously had met in 1999, when Gillerman was Project Leader for an Operations Performance Improvement ("OPI") project at various Nabisco plants,

including the Niles bakery. Gillerman believed that Martino failed to provide her with accurate information in a timely manner and she complained to both the local Project Leader and then to Plaintiff's supervisor at the time.[2] Martino stated that he had assigned one of his staff members to provide information to Gillerman and that the employee fell behind. Martino acknowledged that as Plant Controller, it was his responsibility to provide the requested information. When Gillerman became Plant Manager at the Niles Bakery, she told Martino that he had a "clean slate" with her.

Gillerman gave Martino a year-end performance review in November 2001. Using Kraft's five-step rating scale, Gillerman rated Martino "excellent" (the second highest level), based on the plant's above-target productivity for the year. In her review, Gillerman indicated that she believed Martino was ready to "step into" a corporate finance position.[3] But Gillerman also indicated that Martino needed, among other things, to be more "proactive" in staff development and training; hold weekly training sessions and daily meetings to review goals, procedures, and to provide direction; work more closely with his subordinates; and improve communication generally. Kraft gave employees the opportunity to disagree with performance reviews, but Martino did not disagree by way of written comments to his 2001 year-end review.

---

[2] Plaintiff disputes this fact, but cites to a portion of the record that has nothing to do with his interactions with Gillerman in 1999. To the extent that either party disputes a fact proffered by its opponent but fails to provide support through a valid citation to the record, this Court will disregard the unsupported position.

[3] Plaintiff disputes this fact in his L.R. 56.1 Response to Defendants' Statement of Material Facts. As noted previously, however, Plaintiff supports his disagreement by citing portions of the record that have little or nothing to do with Defendants' statement of facts. For example, Plaintiff cites Pl.'s Dep. Ex. 15 at D 40 in support of his dispute of Defendants' characterization of his 2001 year-end performance review. But an examination of the record reveals that Pl.'s Dep. Ex. 15 at D 40 is a page from Martino's year-end review from December 1998, or three years earlier.

Each year, Kraft plant managers and corporate executives hold a "Talent Planning Session," in which they discuss the strengths, weaknesses, and prospects for promotion of the individuals on the senior staff at their facilities.[4] At the February 2002 Talent Planning Session, Gillerman presented Martino as "[h]ighly trained" and "knowledgeable in all areas of manufacturing finance" but noted that he needed to improve his managerial skills in staff development and training "in order to maximize [his subordinates'] contribution to the Bakery organization."

Over the course of the first half of 2002, however, Gillerman became concerned about Martino's interpersonal interactions, including what she considered as his tendency to be disrespectful towards his colleagues and, during disagreements, to lose his temper. Gillerman discussed some of her concerns with Martino's performance, including issues related to team development and communication, with Rod Christmon, the Human Resources Manager at the Niles Bakery, during the first half of 2002. Gillerman also was troubled by what she considered Martino's failure to be "a team player," to communicate with her and to develop his staff. Several members of Martino's staff found it difficult to communicate with him: they felt that he was likely to lose his temper with them and speak to them in an exasperated tone. In addition, Martino's staff received emails and phone calls from Kraft corporate employees who had asked Martino for information but not received it in a timely fashion. Roger Post, the Niles Bakery Production Manager, concluded that Martino did not want to be involved in day-to-day issues at

---

[4] Kraft calls the most senior staff at its plant facilities "Staff 1.""Staff 2" consists of the people who report directly to Staff 1. Plaintiff, as manager of the Finance Department, was a member of Staff 1, along with the other department managers (Human Resources, Production, Maintenance, Quality Systems, and Engineering).

the plant; if Post wanted timely information from the Finance Department, he typically went to one of Martino's subordinates instead of Martino.

By mid-2002, Gillerman had received complaints about Martino from both Staff 1 and Staff 2 members in several different departments at the Niles Bakery. On August 2, 2002, Gillerman and Christmon met with Plaintiff to conduct his mid-year performance review. Gillerman wrote an outline of the issues she wanted to address in the meeting, which included positive feedback on improvements in Martino's temper outbursts and timeliness to meetings; his strong technical knowledge and skill base; and the good performance of his safety team. In addition, Gillerman noted that Plaintiff had several development needs, including teamwork, plant involvement, and staff development. During the meeting, Gillerman told Martino that he was perceived as "blocking a position," or preventing subordinates from being promoted into his position because he was not viewed as promotable. Despite Martino's technical proficiency, Gillerman informed him that no one in senior management was "singing his praises" and that he needed to address this. Gillerman suggested that Martino contact Carolyn Gibbs, who was then the Manufacturing Controller of Kraft's Biscuit Division, for mentoring and coaching. Within a few days, Martino did contact Gibbs to discuss his review and Gillerman's mentoring suggestion.

On August 15, 2002, Martino sent an email to Rod Christmon, with copies to Gillerman and Gibbs, in which he stated:

> "In accordance with the Americans with Disability Act, please be advised of my disability. I have been diagnosed with having Social Anxiety Disorder, Obsessive Compulsive Disorder and Depression. I have sought out medical treatment to help me minimize the effects of my disability and I continue to be treated for it. Under Kraft's Diversity Policy, I qualify to be considered a

diversity candidate and wish to be considered as such for any promotional opportunities as they may arise."

Martino then listed some positions and locations for which he wished to be considered. Martino sent this email because he believe that his disability would qualify him as a "diversity candidate" under Kraft's Diversity Policy, and that he therefore would receive preferential treatment for promotional opportunities. This email was the first time that Martino disclosed his mental health conditions to anyone at Kraft. Gillerman, Christmon, and Gibbs did not share the contents of Martino's email with anyone else on Staff 1 at the Niles Bakery. Christmon and Martino discussed Martino's email and Christmon indicated that he would look into whether Plaintiff's mental health conditions qualified him as a "diversity candidate."

The only other time Martino discussed his mental health with anyone at Kraft was in November 2002, when he called some of his former managers and colleagues and told them that he had "a problem" for which he was "seeking help." Martino did not tell anyone at Kraft how his mental illnesses affected him and there is no evidence that anyone at Kraft inquired.

Following his August 2002 performance review, Martino attended a "Leading People at Kraft" workshop, which was designed to train employees on managing and training their subordinates. Gillerman also provided Martino with a paper copy of the Kraft "competencies" for his position that she used to evaluate his performance. In September 2002, Gillerman approached Jennifer Meyer, who reported to Martino as the General Accounting Manager in the Niles Bakery. Meyer told Gillerman that she was looking to transfer away from the Niles plant because she was unhappy with Martino's management style. Gillerman also contacted Gibbs to request feedback in preparation for Martino's year-end performance review (which Kraft calls a "Managing and Appraising Performance" or "MAP" review). Gibbs indicated that she had

concerns that the Niles Finance department was "habitually late" in meeting deadlines from headquarters. In addition, Gibbs indicated that Martino had failed to budget certain expenditures in the manner requested, was perceived to be combative in disagreements with colleagues, and had hired staff members without informing her. It was Gibbs' opinion that Martino, as Plant Controller for the Niles Bakery and head of the Niles Finance Department, was responsible for ensuring timely and accurate submission of requested financial information to the corporate headquarters. In a telephone conversation in early November 2002, Gibbs also recounted to Martino her concerns with his department's habitual lateness in providing information.

On November 6, 2002, Gillerman met with Martino to discuss his written 2002 MAP review. Gillerman noted many of the Martino's strengths, including his strong technical skills. But in reviewing Martino's performance for both technical skills and required Kraft leadership competencies, Gillerman concluded that Martino was not a role model or leader for his staff. Gillerman gave Martino a "Good" rating, but noted on the review that the rating was towards the low end of the Good rating because of "the seriousness of his development issues." Martino did not write a rebuttal to his 2002 MAP review, although he was given the opportunity to do so.

Also in November 2002, sometime after his MAP review, Martino spoke with Beth Benner Rudolph, one of his subordinates, about her concerns with the Finance department. She indicated that the department suffered from low morale, lack of cohesion, stress, and poor communication. At some point during that month, Martino had told Juan Delgado, who reported to Rudolph, that Martino would support him in his request for a promotion. Rudolph told Martino that she felt Delgado was not ready to be promoted because he had been in his position for only six months. Martino ultimately agreed with Rudolph, but did not inform Delgado that he

had changed his mind about supporting Delgado for promotion. Instead, he left that responsibility to Rudolph.

In mid-November 2002, Martino left email and voice messages for Kay Boos, who recently had stepped into Carolyn Gibbs' position as Manufacturing Controller for Kraft's Biscuit Division. Boos indicated she had been out of the office and would contact Martino after the Thanksgiving holiday. On December 4, 2002, Martino sent Boos an email to request feedback on why he had not been considered for certain positions in Kraft during the previous year and express interest in being considered for the Director of Marketing, Finance position Boos had just vacated. Martino summarized some of his strengths and referenced his August 15, 2002 email, in which he had requested to be considered a "diversity candidate." on December 13, 2002, Martino and Boos has a phone conversation and discussed Martino's interest in transferring to a new position in the future. During this conversation, Martino and Boos discussed the fact that Martino had lost his temper at a staff meeting, that a "general comment" from other managers was that he "stepped on their toes" and made suggestions that they felt were not his responsibility to make. Boos did not know of any open positions that Martino could fill at that time.

Budget Development Issues

One of the responsibilities of the Finance Department is developing an accurate annual budget for the plant based on the financial productivity targets set by the corporate office and the requests from department managers. Martino testified that all Staff 1 personnel were responsible for all key aspects of plant management and therefore, that it was all of Staff 1's responsibility to ensure that the numbers in the operating budget were accurate. As a practical matter, however,

the accounting and finance department compiled the budget and submitted it to the corporate office. The finance staff, led by Martino, communicated with corporate headquarters about budget changes to meet corporate financial targets.

The Niles Bakery budget consisted of a variable budget and a fixed budget. The variable budget covered costs relating to production, such as paying employees who are directly involved in making the product. The fixed budget covered fixed expenses in each department, including maintenance and sanitation (or, indirect labor). Planning for the Niles Bakery 2003 budget began in late spring 2002, when Doug Fuller, the Plant Cost Manager in Martino's department, prepared a fiscal calendar. The fiscal calendar reflects periods when the plant is not budgeted to run production lines or a "shutdown." Fuller solicited Staff 1 input about their preference for a shutdown week in 2003 and submitted a preliminary fiscal calendar to the corporate office in May 2002, indicating that the shutdown would occur on one of two weeks in late March or early April 2003. On June 12, 2002, Fuller emailed a "preliminary" fiscal calendar for 2003 to Martino and Gillerman, noting that he had not heard from Corporate about the shutdown week and had "picked one." His email did not state which week he picked, but the attached calendar indicated it was March 31-April 4, 2003. Fuller copied only the Maintenance Manager (Dave Olejniczak) and General Accounting Manager (Jennifer Meyer, one of Martino's subordinates) on the message. Martino did not follow up with the corporate office to ensure that the shutdown week had been approved. Likewise, Martino does not know of any Staff 1 meeting in which the budgeted shutdown week actually was discussed, although budget meetings with Staff 1 and the staff of the Niles Finance department occurred throughout the summer and fall of 2002.

In September 2002, Martino submitted a budget to Kraft's Biscuit Division Manufacturing finance department. That department was unable to verify that the budget Martino submitted included the productivity target set by the corporate office. Martino's department submitted draft budget books summarizing the proposed 2003 budget to Staff 1 at a meeting on October 17, 2002. After that meeting, Staff 1 believed that they had received final budget numbers for 2003, even though the proposed budget was not in compliance with the productivity target set by the corporate office. On November 8, 2002, Gary Trider, the Vice President of Manufacturing, Kraft Biscuit Division, issued revised financial targets for each Biscuit Division plant, which required additional budget cuts at each plant. Plaintiff met with Staff 1 later that day to notify them that additional budget cuts were required. Martino stated that indirect labor costs would have to be reduced. Olejniczak, the Maintenance Manager, was on vacation and not present at the meeting. Between October and December 2002, Martino made other cuts and changes to the Niles budget to meet not only the revised incremental targets but also to meet the original productivity targets. The changes to meet the productivity targets were made to the fixed overhead and indirect labor budget and included reducing or eliminating budgeted amounts for maintenance employees and reducing the number of employees on a production crew. Martino did not inform Olejniczak of the changes that he made to Olejniczak's budget, nor did Martino remember that Olejniczak had been absent from the November meeting where additional budget cuts were discussed.

The Niles Bakery used Websmart, a web-based financial reporting tool that reflects plant production performance results against the plant budget, to monitor daily and weekly plant productivity performance. Finance staff at Niles Bakery presented financial results to Staff 1 by

showing them screens from Websmart. Normally, Staff 1 would learn of changes and cuts to the budget through meetings with the Finance department and when they received a copy of the final budget book, typically in the first month of the year. Martino stated, however, that Staff 1 could have accessed the entire 2003 budget through Websmart and, in that way, learned of cuts and changes to their departmental budgets. Plaintiff admitted he never saw Staff 1 "pushing buttons" to use Websmart but that the program was the way that Finance department staff reviewed financial results for department managers. Staff 1 members stated that they did not know how to use Websmart's forecasting features, which would enable them to view the entire annual budget, but rather only knew how to use the reporting or historical features.

FOIP information

Each year, salaried Kraft employees were eligible for an incentive bonus based on their success in meeting targets in quality, safety, productivity, and customer service, called the Field Operations Incentive Plan ("FOIP"). The bonus was calculated by the corporate office from data compiled and submitted by the Finance department at each plant. The Plant Controllers were responsible for gathering, verifying, and submitting the required data to the corporate finance department. On December 14, 2002, Martino received an email from Gibbs, indicated that estimated year-end productivity data was due by the end of the day on December 19, 2002. The corporate finance office was not responsible for verifying the accuracy of the plant data. On December 18, 2002, the Niles Bakery's Quality Systems Manager, Joan Chibe, provided Martino with the raw number for the number of complaints of foreign material in product per million units produced (1.80), which was the format that she used to report this number to the corporate quality office. Martino informed Chibe via email on December 20, 2002, that he needed to report

the percent improvement over the previous year's complaints of foreign material, not the raw data. Later that morning, without waiting for a response from Chibe, Martino submitted FOIP numbers to the corporate finance department, using the raw number for foreign material complaints. This submission was both inaccurate and late; Martino acknowledges that he knew it was inaccurate when he submitted it but did not inform anyone else. Shortly before the end of the day on December 20, 2002, Chibe responded to Martino's email request for a percentage figure and informed him that the raw number she had provided translated into a 38.7% improvement over the previous year. Martino did not inform corporate finance that the data he had submitted was inaccurate nor did he submit the new, accurate figure. At the beginning of January 2003, Martino emailed Gillerman and Staff 1, but not the corporate finance office, with "the latest estimate" of the FOIP bonus. This estimate included the correct foreign material complaints figure. The Niles Bakery Staff 1 believed, based on Martino's representations to them, that the correct FOIP numbers had been submitted to the corporate office and that their FOIP bonuses would be slightly higher than projected. Martino never submitted the correct foreign material complaints number to the corporate office.

On Saturday, January 18, 2003, Martino went to work to assist two of his staff members with inventory. Martino spent most of the day alone in his office. At some point during the day, Martino sent an email to Gary Trider and Don Valenzano (Carolyn Gibbs' direct supervisor), complaining about harassment by Dawn Gillerman, and specifically stating that he believed Gillerman had made "defamatory [and] derogatory remarks" about him at the February 2002 Talent Planning Session. Martino copied Gillerman and Christmon on the email. He stated that

her conduct had created a "hostile work environment" which had adversely impacted his health. Plaintiff did not go in to work on any day during the following week but rather called in sick.

On January 27, 2003, Christmon called Martino and Martino stated that he was suffering back pain and stress and was seeking physical therapy for his back. Martino was not sure how long he would be off and indicated he was taking things "day by day." Christmon informed Martino that he was sending paperwork for Martino to fill out to receive short-term disability leave. On January 28, 2003, Martino received the paperwork and called in his short-term disability claim to Kraft's disability administrator company. He indicated that he was suffering a back problem but that he had no other medical condition that was restricting him from work. On February 1, 2003, Martino saw Dr. Karimi, who gave him a work excuse recommending a "medical leave of absence until further notice" due to stress. Around mid-February, Martino told Christmon that although his back doctor had released him back to work, his psychiatrist recommended that he continue on leave due to stress. Kraft's disability administrator company notified Plaintiff in late February that it had requested but had not received additional information about Plaintiff's condition from Dr. Karimi and that it would not be able to process additional leave for him. Martino decided to return to work and got a release to work from Dr. Karimi, but first requested and received a week of vacation at the beginning of March to go skiing with his nephews. Plaintiff returned to work on March 10, 2003.

While Plaintiff was out on short-term disability, a number of problems with the Plant budget became apparent. By the end of January, the standard month-end reports shows that the actual financial numbers for the month were not meeting the budgeted numbers. Staff 1 could not determine why their departments were exceeding the budget and they therefore were

concerned that this trend would continue. Martino's subordinates held a budget review meeting on January 31, but were unable to answer all of Staff 1's questions and were unable to review the entire budget during the time allotted; they stated, furthermore, that they did not review the 2003 Budget Calendar, which was included in the Staff 12 budget books, or discuss any budgeted plant shutdowns at the meeting. Moreover, Martino's subordinates stated that they were unaware of the budgeted shutdown. During February, Martino's staff continued to try to determine the cause of the budget problems. They brought in a cost accountant at Kraft's Portland Bakery to assist them and were ultimately able to identify the primary source of the problems as the indirect labor budget. Additional budget problems surfaced, however, including a failure to budget for security costs.

At the beginning of February, Niles Bakery employees received their FOIP bonus checks, which were lower than expected. Gillerman learned at this point that Martino had submitted incorrect FOIP data to the corporate office. The corporate office confirmed that it had calculated the FOIP data based on the information submitted by Martino. Gillerman asked Gary Trider for permission to issue corrected checks, which was denied; Gillerman did not have authority to issue corrected checks on her own. While investigating the FOIP issue, Gillerman learned that Martino had not placed an "out of office" message on his phone or email when he went on short-term disability. Martino placed an out-of-office message on his voicemail in mid-February. Previously, Martino had been checking his messages from home on an irregular basis and forwarding them to other employees or responding. Finance department staff members, however, had received phone calls from Kraft employees wondering why Plaintiff was not returning their calls. As far as Martino knew, no one from Kraft had access to his voice mail while he was out

of the office. In addition, Martino asked a finance department staff member to send out an email message informing a number of Kraft employees that Martino was out sick; this happened on January 29 or January 30, 2003. He checked his email messages "sporadically" from home but was unable to open any email attachments. In mid-February, Gillerman learned that Martino had not placed an out-of-office message on his email, so she asked an IT staff person to do so. Martino stated that he had tried to change his email from home but said that it "apparently did not take."

Gillerman contacted Gary Trider and Kay Boos in mid-February 2003 to discuss her growing concerns about Martino's performance, including her concerns about budget cuts made without the involvement of affected department managers; submission of incorrect FOIP data; and failure to adequately train finance department staff. She also indicated that she thought Niles Bakery might fail to meet its 2003 financial targets because of the budget irregularities they had discovered. Gillerman asked for someone to come assist the Niles finance department while Martino was out and once he returned.

In approximately February 2003, Christmon contacted Karen Vaughn, Human Resources Director for Central Area Operations, who was his indirect supervisor, to ask for advice on Martino's performance deficiencies. Vaughn advised Christmon that Gillerman should communicate clearly to Martino what his performance problems were and what her expectations for his performance were. Gillerman also discussed Martino's performance with Vaughn and Vaughn recommended that Gillerman issue a written warning and performance improvement plan to Plaintiff.

On February 27, 2003, Martino contacted Christmon to ask about the status of his harassment complaint against Gillerman. Shortly thereafter, Christmon sent a written response to Martino, in which he concluded that Gillerman had not made defamatory or derogatory comments about Martino. Christmon did not interview either Martino or Gillerman (or anyone else), but rather responded to the complaint based on conversations he had had with the parties involved over the course of 2002 and 2003. Martino did not express disagreement with Christmon's written response; Martino also did not indicate that he wanted to pursue his harassment complaint any further.

When Martino returned to work on March 10, 2003, he brought a copy of Dr. Karimi's work release to Christmon and requested Family and Medical Leave Act ("FMLA") paperwork. He did not state that he needed to take leave imminently. On April 11, 2003, Dr. Karimi faxed the completed FMLA paperwork to Christmon, indicating that Martino suffered a chronic medical condition that would require him to take intermittent leave at some unknown future point, but that Martino was not currently incapacitated.

Upon his return to work in March 2003, Martino was asked to hold a budget meeting with Staff 1. Martino scheduled a meeting, but cancelled it so that he could attend a controllers' conference, although Gillerman asked who had advised him to attend the conference. At the end of March, Martino held a budget meeting with Staff 1 but was unable to answer all of their questions. Gillerman then asked Martino to hold one-on-one meetings with department managers to address their questions and indicated that she wanted to know the status of the meetings. Martino conducted these meetings in late March and early April 2003. His notes indicate that

there were issues that he was supposed to follow up on after the meetings. Staff 1 members did not receive subsequent information from Martino.

Gillerman continued to have concerns about Martino's communication and timeliness. At the end of March, Martino told Gillerman and Christmon that he was interested in obtaining a lateral position at Kraft's Glenview, Illinois facility and, as he was required to do, asked for Gillerman's support. Gillerman informed him that she would not support a transfer application until his performance at Niles demonstrated sustained improvement.

In light of Martino's performance issues, Gillerman and Christmon drafted a written warning, including a performance improvement plan, that was reviewed by Karen Vaughn. Gillerman intended the warning to address both 2002 and 2003 performance issues. The performance improvement plan gave deadlines by which Martino was required to comply with certain expectations. On April 8, 2003, Gillerman and Christmon met with Martino to present the warning and performance improvement plan.

Plant Shutdown Error

Production scheduling at Kraft plants involves the corporate finance and logistics departments and the plant production and finance departments, along with the plant production scheduler. The plant finance department submits a preferred plant shutdown date to the corporate finance and logistics departments which approves the date. The shutdown date is then entered into the plant budget by the finance department and communicated by the finance department to the department managers. During the production year, the corporate logistics department sends tentative eight-week advance schedules to the production scheduler at the plant which indicate what production should occur at the facility in that time frame. These schedules help the plant

determine that they have adequate staffing and supplies. The production scheduler holds a production meeting with the department managers or their staff, including the finance department, to discuss the schedule. If there are problems with the tentative schedule, they are raised at that time and the production scheduler resolves them with the corporate logistics office. In 2003, none of the eight-week production schedules that the Niles production scheduler received from logistics included a shutdown for the week of March 31, 2003. The Production Manager was unaware that a shutdown had been budgeted for that week.

After his return to work, Martino did not compare the production schedule with the budgeted calendar. The Niles Bakery ran at full capacity during the week of March 31, 2003, resulting in $128,500 in unbudgeted expenses. Martino described this as a "large variance." The variance amounted to approximately 5% of the Niles Bakery's targeted goal of saving approximately $2.5 million in 2003. One of Martino's staff members discovered the shutdown error and on April 7, 2003 emailed his direct supervisor, copying Martino and another finance department staff member, to notify them of the error and the budget variance. Martino did not bring either the shutdown error or the budget variance to Gillerman's attention on April 7 or April 8, although he met with Gillerman and Christmon on April 8 to discuss his performance issues. Gillerman did not learn of the shutdown error until after her meeting with Martino on April 8. She immediately began reviewing the communications she had received from Finance about the budgeted shutdown.

On the morning of April 9, 2003, Martino met with Christmon to discuss his belief that the written warning was "inaccurate" because it dealt with issues that had not been addressed or raised by January 17, 2003, the last day he worked before his short-term disability leave.

-19-

Gillerman entered the room during this meeting and asked Martino about the budget variance resulting from the shutdown error and why he had not reminded anyone about the budgeted shutdown. Martino said he would have to check his notes. He subsequently emailed Gillerman and informed her that the shutdown had been communicated in an attachment to a June 2002 email from one of his staff members and was listed on the budget calendar, a one-page document in the budget books distributed by his staff members at the January 31, 2003 budget meeting. Through an investigation of the shutdown error, Gillerman learned, however, that no shutdown week had ever been "officially" budgeted for the plant with the corporate logistics office.

After his April 8 and 9, 2003 meetings with Christmon and Gillerman, Martino emailed them, contending that the written warning mentioned "errors" that he believed happened while he was out on leave and for which he contended he could not be held accountable, because to do so would violate the FMLA and ERISA. Gillerman became concerned that Martino's performance was not only deficient but that he also refused to accept responsibility for his errors. She then requested information about the FOIP submissions and the one-on-one budget meetings from Niles Staff 1 members and corporate finance employees. In addition, she learned that portions of the 2003 budget had still not been submitted to the corporate office.

On April 14, 2003, Gillerman decided that she had to terminate Martino because of his performance deficiencies as Plant Controller. She told Kay Boos of her decision on April 14, and Boos supported her. On April 15, 2003, Karen Vaughn and her boss, Rob Schindelholz, came to the Niles Bakery to conduct one-on-one meetings with Gillerman and Staff 1. Gillerman informed Vaughn and Schindelholz that she had decided to terminate Martino the next day, and they approved the decision. Vaughn and Schindelholz also met with Martino, who told them that

he felt the written warning which held him accountable for "errors" that had occurred while he was on leave was a violation of the FMLA. He also told them he wanted to obtain a lateral position outside the Niles Bakery. According to Vaughn, Martino would not have been eligible for a lateral position because he had a written warning against him.

On April 16, 2003, Gillerman and Christmon met with Martino in Gillerman's office and Gillerman informed Martino that she was terminating him that day for unacceptable performance. Prior to Martino's termination, Christmon did not inform anyone at Kraft, including Gillerman, of Plaintiff's request for, or submission of, FMLA paperwork because the paperwork indicated that Martino was not presently incapacitated. Gillerman was not aware that Martino had requested FMLA paperwork.

On May 8, 2003, Martino appealed his termination to Gary Trider, stating that he was unable to gain Gillerman's full confidence or support during the year-and-a-half that he reported to her at Niles. Trider denied Martino's appeal in a letter dated May 13, 2003.

Additional issues with the Niles Bakery budget were discovered over the course of 2003, which led to Gillerman requesting relief from the budget in October 2003. The relief was denied. Niles ultimately met its 2003 budget target "by making drastic cuts (including head count reductions) and by achieving substantial savings in production (including taking extra shutdowns)."

Martino filed suit against Kraft and Gillerman for disability discrimination and FMLA violations. Kraft moved for summary judgment and this matter is not before the Court.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show there is no genuine issue of fact. Such a showing entitles the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 720 (7th Cir. 2004). A genuine issue of material fact exists only when a reasonable factfinder could find for the nonmoving party, based on the record as a whole. The court does not weigh the evidence and it does not make credibility determinations. Instead, the court makes all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000); *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000).

## III.    COMPLIANCE WITH LOCAL RULE 56.1

Before reaching the legal analysis, this Court feels compelled to address the parties' Local Rule 56.1 submissions. Both plaintiff and defendant submitted multiple volumes of material in support of their statements of fact. The Court reminds the parties that quantity is not synonymous with quality. The purpose of a summary judgment proceeding is to identify those cases that can be resolved without a trial. To that end, the courts in this District have clarified the requirements of summary judgment pleadings in Local Rule 56.1. This rule requires parties to file statements of material facts "as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." N.D. Ill. L.R. 56.1(a)(3). Local Rule 56.1 provides the parties' evidentiary obligations in a summary judgment proceeding. Courts in this district have broad discretion to enforce the rule, and the Seventh Circuit regularly upholds

strict enforcement of Local Rule 56.1. *See, e.g.*, *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (citing cases).

This Court urges parties in this case, in particular Plaintiff and all of Plaintiffs' counsel, to review Local Rule 56.1. Judge Castillo's detailed discussion of Rule 56.1 requirements and procedures in *Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000), provides an excellent guide to proper form for statements of material facts. "There are three separate types of statements governed by Rule 56.1: the movant's statement, the nonmovant's response and statement of additional facts, and the movant's response to the additional facts." *Id.* at 583. Statements of material fact should consist of short statements making specific references to materials supporting the fact set forth in the statement. A nonmovant's statement of facts must "cite specific evidentiary materials" that justify the nonmovant's denial of a movant's factual allegation. A general denial is insufficient. The statement of facts is not the place for argumentative statements; it is also not the place for drawing inferences or making legal arguments. *Malec*, 191 F.R.D. at 584.

Kraft has filed a motion to strike portions of Martino's Local Rule 56.1 statement. This Court has reviewed the motion and the parties' submissions and finds the motion to strike inappropriate. Defendants can object to Plaintiff's L.R. 56.1 violations in their reply, as they did, which is more than sufficient to enable this Court to determine the admissibility of a fact. Defendants' Motion to Strike is denied.

## IV. LEGAL ANALYSIS

### A. AMERICANS WITH DISABILITIES ACT

In Count III of his Second Amended Complaint, Martino alleges that he was discriminated against in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a). The ADA makes it unlawful for certain employers, such as Kraft, to discriminate against disabled employees by firing them because of their disabilities or by refusing to make "reasonable accommodations" for their disabilities. 42 U.S.C. § 12112(a), (b)(5)(A); *Basith v. Cook County*, 241 F.3d 919, 926-27 (7th Cir. 2001). Martino therefore must prove that he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position" in question. 42 U.S.C. § 12111(8). Kraft contends, however, that Martino cannot prove that he was "disabled" within the meaning of the ADA.

The ADA defines "disability" as "a physical or mental disability that substantially limits one of more major life activities"; "a record of such impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12012(2); 29 C.F.R. § 1630.2(g). According to Martino, his depression, OCD, and social anxiety disorder substantially impaired his ability to think and to work. In addition, Martino contends that he was perceived as disabled by Kraft and was denied a reasonable accommodation when he was not treated as a "diversity candidate" for promotional or lateral job positions.

The problem with Martino's disability claim is that he has not pointed to any evidence that his mental health conditions limited his ability to think or to work. *See Ogborn v. United Food & Comm'l Workers Union*, 305 F.3d 763, 767 (7th Cir. 2002). Major depression has been

recognized as a disability under the ADA. *E.g.*, *Ogborn*, 305 F.3d at 767; *Krocka v. City of Chicago*, 203 F.3d 507, 512 (7th Cir. 2000). But the "term 'substantially limits' means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). The record reflects that Martino went on short-term disability for approximately six weeks between January 21 and March 3, 2003, for a "back pain" and "stress." Martino presents no evidence that his disabilities limited his ability to work before his short-term disability or after he submitted his release to work from his psychiatrist. In fact, his psychiatrist's treatment notes indicate that Martino was looking forward to returning to work. Even after drawing all reasonable inferences in favor of the plaintiff, as this Court is required to do, Martino has failed to show that his work performance was substantially limited by his mental health conditions.

Martino contends that even if his mental health conditions did not fall with the ADA definition of "disability," the ADA still protects him because Kraft employees regarded him as disabled. To establish that he was "regarded as" disabled, Martino must show that Kraft knew about his conditions and also held "exaggerated" or "mistaken" views about the seriousness of his conditions and their effect on him. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). In support of this claim, Martino asserts that Gillerman told him that she knew someone with OCD, one of the conditions Martino stated he had, and that this person had difficulty "doing anything." Martino also contends that the cause of his short-term disability was readily apparent

to Kraft management, although he does not specify in his brief what his "need for leave" was.[5]

Finally, Martino contends that he was given "baseless" performance warnings and reprimands, which he characterizes as a failure to accommodate him.[6] According to Martino, he had not received performance warnings until after he disclosed his conditions. Kraft contends that Gillerman, Gibbs, and Christmon, the Kraft employees to whom Martino disclosed his mental health conditions, did not tell any other employees about Martino's disclosures. In addition, Christmon testified in his deposition that he did not understand Martino's conditions to fall within the definition of mental disability in Kraft's diversity policy.[7] Both Gillerman and Christmon assert that they did not view Martino as disabled. Kraft has provided ample evidence that the reprimands and performance warnings Martino received were based on actual discrepancies in the Niles Bakery budget and other financial data that Martino was responsible, as Plant Controller, for collecting and submitting.

Although Gillerman's comment might be insensitive and inappropriate for the workplace, Martino does not suggest that she, or anyone else at Kraft, told him that she believed that his conditions would prevent *him* from "doing anything." A series of cases have held that a single, isolated comment which is not contemporaneous with any adverse employment action fails to

---

[5] In the argument section of its Response to Defendants' Motion for Summary Judgment, Plaintiff failed to cite to its L.R. 56.1 statement of undisputed facts at any point. This Court will not search through ten-plus volumes of exhibits and appendices to find support for assertions contained in briefs; it is the party's responsibility to provide proper citations. (See this Court's standing order on motions for summary judgment.)

[6] Plaintiff's argument that Kraft denied his request for a reasonable accommodation is unavailing. A request to be considered a diversity candidate for future lateral or promotional position applications is not a request for reasonable accommodation to perform the essential functions of the current position. For these reasons, this Court will not consider it.

[7] This Court notes that Kraft and its employees, including members of its human resources staff, display a remarkable lack of awareness about the specifics of their employment policies.

rise to the level necessary to establish discrimination. *See, e.g.*, *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997); *Coleman v. Keebler Co.*, 997 F. Supp. 1102, 1120 (N.D. Ind. 1998). Martino has not presented evidence that Kraft employees, particularly his supervisors, held "exaggerated" or "mistaken" views about either his conditions or the impact they had on his work performance. Martino implies that his mental health conditions disclosure led Gillerman and Kraft to place more emphasis when evaluating him on the leadership competencies of his position requirement than the technical competencies. There are a number of problems with this argument, not the least of which is that Martino cannot dispute that the "core competencies" of Kraft employees at his level included both leadership and technical competencies. From the record before this Court, the increased emphasis on leadership skills coincided with the Kraft-Nabisco merger and with Gillerman's arrival at the Niles plant.

Even if his "regarded as" claim fails, Martino contends that he had a "record of" disability under the ADA. To succeed under this theory, the plaintiff must produce both his diagnosis with a disability and a record reflecting that the disability substantially limits him. *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 n.7 (7th Cir. 1998). Furthermore, the plaintiff must show that the employer was aware of the record. *Id.* at 510 n.8; 29 C.F.R. § 1630, app. § 1630.2(k) (interpretive guidance). In his complaint, Martino contended that he "ha[d] a record of impairment ... which affected his ability to sleep and eat, but not his ability to work." Pl.'s Second Am. Compl. at ¶ 79.[8] Martino failed to set out his "record of" disability argument in

---

[8] This Court notes that although Martino described the major life activities which his mental health condition substantially limited as sleeping and eating in his complaint, he has apparently construed his limited major life activity as working for the purposes of his opposition to Defendants' Motion for Summary Judgment. Although this is manifestly improper, this Court does not address it because Plaintiff's ADA count fails either way.

his opposition to summary judgment and this Court therefore determines that he has abandoned it.

This Court finds that Martino has failed to show that he has a "disability" as defined in the ADA. Therefore, he has failed to establish a prima facie case of discrimination on the basis of disability. This Court grants summary judgment to the Defendants on Martino's claim of disability discrimination in violation of the ADA (Count III).

B.    FAMILY AND MEDICAL LEAVE ACT

Martino raises two claims against Kraft under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615: that Kraft interfered with Martino's substantive rights under the FMLA; and that Kraft retaliated against him for attempting to exercise his FMLA rights.

1.    Substantive Rights

The Family and Medical Leave Act entitles eligible employees to up to twelve weeks of unpaid leave in a year for serious health conditions and makes it unlawful for an employer to refuse to reinstate, or to discriminate against, an employee who takes valid leave under the Act. 29 U.S.C. §§ 2612(a)(1), 2614(a)(1), 2615(a)(2). The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any of the substantive rights provided by the FMLA. 29 U.S.C. § 2615(a)(1).[9]

Martino makes two related interference claims: first, that Kraft interfered with his substantive FMLA rights by not putting him on FMLA leave from January 21-March 3, 2003,

---

[9] The Department of Labor has issued regulations defining what is a "serious health condition" entitled an employee to FMLA leave. 29 C.F.R. § 825.114.

and by holding him accountable for work not performed during that period;[10] and second, for terminating his employment on April 16, 2003 after he had requested future intermittent FMLA leave. This Court will address these claims in sequence.

a.    *Short-Term Disability*

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act. 29 U.S.C. § 2615(a)(1). Martino argues by implication that Kraft interfered with his substantive rights under the FMLA when it characterized his January 21-March 3, 2003 as short-term disability, rather than FMLA. Martino asserts that he requested leave from work to care for a serious health condition, specifically his degenerative disc disease and low back pain, in January 2003. According to Kraft, Martino failed to give proper notice of his need for FMLA leave due to a serious health condition. In addition, Kraft argues that his claim must fail because he was given all the leave he requested. Finally, Kraft asserts that it did not hold Martino accountable for work not performed while he was out on leave but rather for work deficiencies preceding his leave, but which were discovered while he was out of the office.

An employee who foresees that he or she will seek FMLA leave must give 30 days advance notice to the employer before the leave is to begin. In this case, there is no dispute that Martino's need for leave was foreseeable. When the need for leave is not foreseeable or 30 days advance notice is not practicable, such as in a medical emergency, notice must be given "as soon as practicable." 29 C.F.R. § 825.302(a). This means "as soon as both possible and practical" and

---

[10] Martino's argument that Kraft improperly held him accountable for work not performed during his leave is more properly characterized as a claim of FMLA retaliation and will be addressed as such, *infra*.

"ordinarily would mean at least verbal notification to the employer within one or two business days of when the need for leave becomes known to the employee." 29 C.F.R. § 825.302(b). During the week of January 21, 2003, Martino admits that he called in "sick" every day, leaving messages for Gillerman that he was not feeling well and would not be in that day. When Christmon contacted Martino on January 27, 2003, Martino said he was not feeling well because of back pain and stress, and was having physical therapy for his back.

In construing the facts in the light most favorable to the plaintiff, this Court views Martino's statement that he needed time off because of back pain and "stress" as a potentially valid request for FMLA leave. The Seventh Circuit has interpreted the FMLA notice requirement to mean more than simply calling in "sick." *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001). But Martino went slightly beyond "sick" when he referenced "stress." *See, e.g., Spangler v. Fed'l Home Loan Bank of Des Moines*, 278 F.3d 847, 853 (8th Cir. 2002). Christmon and Gillerman were both aware of Martino's mental health conditions in January 2003, even though Martino had never taken leave for mental health reasons before.[11] Kraft may have an argument that Martino's notice was vague or unclear or that it violated Kraft's own notice requirements. However, this Court cannot say, as a matter of law, that no genuine issue of material fact with regard to notice exists. For that reason, this Court denies summary judgment against Martino on his interference with substantive FMLA rights (Count II), with respect to his January 21-March 3, 2003 leave.

---

[11] This Court notes that Martino's FMLA claim at least implies that he viewed his August 15, 2002 email regarding his mental health conditions as a form of "inoculation" against future employment disputes. This Court need not address this at this time, but notes that such a position is unsupported by the law.

b.    *Termination*

Martino asserts that Kraft interfered with his substantive rights under FMLA when it terminated him on April 16, 2003 because he had submitted FMLA leave paperwork on April 11, 2003, thus effectively denying his request for FMLA leave. The evidence shows that Martino's psychiatrist faxed completed FMLA paperwork to Christmon on April 11, 2003, indicating that Martino would need future intermittent leave for a "chronic medical condition" but that Martino was "not currently incapacitated." The FMLA states that an employee is entitled to leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Therefore, as of April 11, Martino was not entitled to FMLA leave because he was not presently unable to perform the functions of his position. Christmon did not inform Gillerman that Martino had submitted FMLA paperwork. Martino raised FMLA in his communications with both Gillerman and Christmon about the written warning and performance improvement plan he received on April 9, 2003, stating that the documents violated the FMLA.

Martino was terminated because of performance deficiencies, not because of his short-term disability leave or his request for future intermittent FMLA leave. No reasonable juror could conclude otherwise. In addition, Martino does not contend that Kraft interfered with his FMLA rights between April 11 and April 16, 2003; in short, he did not request immediate FMLA leave and did not give notice to Kraft of his need for a leave effective prior to April 16, 2003. Martino implies that by requesting future intermittent leave, he could not be terminated because termination would prevent him from taking leave. This argument is unavailing. Employers may "fire employees for poor performance if they would have fired them for their

performance regardless of their having [requested] leave." *Ogborn*, 305 F.3d at 768. "Put simply, an employee is not afforded greater rights than he would otherwise have merely because he takes FMLA leave." *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003). The question of whether Martino was entitled to FMLA leave, however, is a question of law. Martino's FMLA paperwork indicated that he sought future intermittent leave but was not presently incapacitated. Even drawing all reasonable inferences in favor of the Plaintiff, this Court finds that Martino has not established that Kraft's decision to terminate him interfered with his rights under the FMLA. Summary judgment on that portion of Martino's claim is granted to the defendants.

2.      FMLA Retaliation

In Count I of his second amended complaint, Martino contends that Kraft terminated him as retaliation for his exercise of his FMLA rights. Specifically he contends that his six-week short term disability leave was used as "a negative factor against him" in the written warning and performance improvement plan he received. Martino also asserts that his termination was based on events that occurred while he was out on disability leave and for which he could not be held accountable. Kraft argues that Martino was terminated for poor performance.

A plaintiff can demonstrate retaliation under the FMLA by either the direct or indirect method, which are familiar from ADA and Title VII case law. Martino puts forward no direct evidence that Kraft retaliated against him by terminating him for exercising his FMLA rights. He did present circumstantial evidence, namely that he submitted his request for future intermittent leave on April 11 and was terminated on April 16, 2003. According to Martino, the timing of these events is highly suspicious and would be sufficient to allow a jury to conclude that Kraft terminated him to retaliate against him for requesting FMLA leave. Suspicious timing is a kind

of circumstantial evidence available under the direct method of proof. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). But suspicious timing does not create a "magical formula which results in a finding" of retaliation. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999). Temporal proximity can create an issue of fact if the adverse action follows immediately after the employer learns of the employee's disability. *Buie*, 366 F.3d at 507.

Here, however, suspicious timing is the primary evidence in support of Martino's position but it is insufficient to create an issue of fact. Even when the Court views the evidence in Martino's favor, it is clear that there were serious concerns about his performance well before he was terminated. The evidence indicates that Gillerman began expressing concerns about Martino's performance in his August 2002 performance review and that her concerns grew steadily as the budget discrepancies, communication failures, and bonus underpayment became known. The shutdown error during the week of March 31, 2003 and Martino's denial that he was or could be held accountable for a failure to communicate the budgeted shutdown were the final straw. Given Martino's litany of performance problems at work, a reasonable jury could not find that Kraft terminated him because he attempted to exercise his FMLA rights by requesting future intermittent leave, by announcing that he had mental health conditions, or by taking a six week short-term disability leave.

To prove retaliation via the indirect method under the FMLA, a plaintiff must show that (1) after engaging in protected activity; (2) only he, and not any similarly situated employee who did not engage in protected activity; (3) was subjected to an adverse employment action; (4) even though he was performing his job in a satisfactory manner. *Buie v. Quad/Graphics, Inc.*,

366 F.3d 496, 503 (7th Cir. 2004); *see also Mitchell v. Dutchmen Mfg., Inc.*, 389 F.3d 746, 749

(7th Cir. 2004) (referencing the *Buie* framework with approval). Failure to satisfy any element of

the plaintiff's prima facie case is fatal to an employee's retaliation claim. *Mitchell*, 389 F.3d at

749 (citing *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)).

Martino's retaliation claim fails under the indirect method as well because he is unable to

show that a similarly situated employee who did not engage in protected activity was treated

more favorably than he. Martino contends that other managers were not terminated after failing

to communicate information or being late to meetings. However, the record shows that other

managers were in fact disciplined for tardiness. More to the point, Martino fails to show that any

other manager had performance issues that were as serious or  as numerous as his. Martino does

not show that other managers were responsible for collecting and submitting the yearly FOIP

bonus to the corporate offices by a certain date, or that other managers were responsible for

compiling, submitting, and publishing the final annual plant budget by a certain date. He does

not show that other managers were significantly tardy in meeting the responsibilities of their

positions, much less that they were not disciplined for doing so.[12] Instead, he asserts that

Gillerman's failure to fire Christmon for not notifying her of Martino's submission of FMLA

paperwork demonstrates that Gillerman's reasons for terminating Martino were pretextual. But

---

[12] Martino argues in his brief that the Production Manager, who was responsible for actually shutting the plant down during a shutdown period, was the "true reason" the plant did not shutdown and therefore went $128,500 over budget. The evidence, however, demonstrates that not one member of the Niles Bakery management staff were aware that the week of March 31, 2003 had been budgeted for a shutdown. Moreover, the corporate logistics department, which scheduled plant production, had no record of a shutdown for the Niles Bakery. Martino's attempt in his brief to focus blame elsewhere and avoid accountability paradoxically strengthens Kraft's contentions that Gillerman lost confidence in Martino because of his unwillingness to take responsibility for his performance deficiencies.

Martino provides no support for this comparison and this Court finds it illogical. Because Martino fails to establish a prima facie case, this Court grants summary judgment for the Defendants on Martino's retaliation in violation of FMLA claim (Count I).

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted as to Plaintiff's Count I (FMLA retaliation), Count III (ADA), and as to Plaintiff's Count II (FMLA substantive rights) with respect to Plaintiff's termination. Defendants' motion for summary judgment is denied as to Plaintiff's Count II with respect to Plaintiff's January 21-March 3, 2003 leave.

Enter:


/s/ David H. Coar

_____
David H. Coar
United States District Judge


Dated: **July 5, 2005**